# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ABIGAIL JOYANNA ANDERSON,   ) | |
|                    ) | |
|     Plaintiff,       ) | |
|                    ) | |
|     v.            ) | No. 11 C 6857 |
|                    ) | |
| CAROLYN W. COLVIN, Acting  ) | |
| Commissioner of Social     ) | Magistrate Judge |
| Security,[1]            ) | Maria Valdez |
|                    ) | |
|     Defendant.     ) | |
|                    ) | |

## MEMORANDUM OPINION AND ORDER

This is an action brought under 42 U.S.C. § 405(g) to review the final decision of the Commissioner of Social Security denying plaintiff Abigail Anderson's claim for Social Security Disability benefits. The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Anderson's motion for summary judgment [Doc. No. 24] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings.

---

[1] Carolyn W. Colvin is substituted for her predecessor Michael J. Astrue pursuant to Federal Rule of Civil Procedure 25(d).

# BACKGROUND

## I.    PROCEDURAL HISTORY

Anderson originally applied for Social Security Disability benefits on March 16, 2009, alleging life-long disability due to mental retardation and organic mental disorders. (R. 100.) The application was denied on September 17, 2009 and upon reconsideration on January 12, 2010. (R. 100-08.) Anderson filed a timely request for a hearing by an Administrative Law Judge ("ALJ"), which was held on May 2, 2011. (R. 11-24, 116-20.) Anderson personally appeared and testified at the hearing and was represented by counsel. (R. 11.) Anderson's mother; a medical expert; and a vocational expert also testified at the hearing. (*Id.*)

On May 24, 2011, the ALJ denied Anderson's claim for benefits and found her not disabled under the Social Security Act. (R. 24.)  The Social Security Administration Appeals Council denied Anderson's request for review of the decision on August 5, 2011, (R. 2-4), leaving the ALJ's decision as the final decision of the Commissioner and therefore reviewable by the District Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

## II.    FACTUAL BACKGROUND

### A.    Background

Anderson was born on May 16, 1990, and at the time of the hearing, she was nearly twenty-one years old. (R. 16, 100.) Her only prior employment was as an

assistant coach at a martial arts summer camp in 2006.[2] (R. 257.) Anderson attended Evangelical Christian School for a time when she was under twelve years of age and Christian Liberty Academy at some point before ninth grade, although the record is conflicting as to her exact years of attendance. (R. 244.) She did not attend any special education classes at these schools. (*Id.*) She also attended Sylvan Learning Center for a period of time. (*Id.*) At all other times through high school, she was homeschooled by her mother.

In a June 22, 2009, function report completed by Anderson's mother as an adult third party, she stated that Anderson sometimes feeds the dog and cleans, but she will take a long time to complete a task if she feels withdrawn or does not want to do it. (R. 250-51.) Anderson's hobbies include watching television and making key chains, but she does not do them that often. (R. 252.) She loves talking and spending time with others, and she regularly goes to church and the mall. (*Id.*)

She needs to be accompanied when she goes places, because she might become confused and get lost. (R. 251, 253.) She does not prepare her own meals, and she cannot pay bills, count change, handle a savings account, or use a checkbook. (R. 251-52.) Anderson has difficulty understanding, following instructions, and her memory and concentration are also affected by her disability. (R. 253.) She cannot follow written instructions well at all, and she can only occasionally follow spoken instructions. (*Id.*) Anderson does not handle stress or

---

[2] Anderson apparently worked a total of 50 hours at the summer camp at a rate of $5.00 per hour. (R. 236, 258.)

changes in routine very well. (R. 254.) Anderson's mother also reported that while she gets along with authority, she has a very short attention span, and she can become frustrated and rebellious when asked to put in more effort. (R. 255.)

Anderson's mother completed another function report on July 24, 2009, although this report was directed to the claimant herself. (R. 260-70.) This report stated that Anderson prepared sandwiches and frozen dinners but answered "turning on the stove is dangerous do not know how long it takes to cook food" in response to a questioning asking her to explain why she cannot or does not prepare meals. (R. 262.) She does chores including sweeping, vacuuming, washing dishes, and cleaning out the refrigerator, but she needs to be told how to do them. (*Id.*)

This report also stated that Anderson cannot go out alone because she is fearful and has no sense of direction. (R. 263-64.) She does not know how to drive. (R. 263.) Anderson cannot pay bills, count change, handle a savings account, or use a checkbook because she does not know how to read, add, or subtract. (*Id.*) She frequently enjoys her hobbies of making jewelry, walking, watching television, and going to church, and she loves spending time talking with family and friends. (R. 264.) However, sometimes she isolates herself in her room with her dog or becomes combative when asked to do something she does not want to do. (R. 265.) She has difficulty retaining knowledge, staying on task, and comprehending. (*Id.*) She reports being unable to follow written instructions, and she does not follow spoken instructions well, depending on the instruction. (R. 265.) Anderson's mother reports that she is in constant need of monitoring and help. (R. 267.)

An SSA field officer who conducted a phone interview reported that most of the interview was conducted with Anderson's mother. (R. 247.) It seemed to the interviewer that Anderson needed to be told by her mother, "letter by letter, how to sign her name on the medical release form that they had at home. [Anderson] seemed to rely heavily on mom for assistance." (*Id.*) On various disability and medical release forms in the record, Anderson printed her name and spelled it five different ways – Andrson, Androsn, Anberson, Anbernos, and Anderson. (*See, e.g.,* R. 6, 103, 110, 382, 394.)

**B.      Testimony and Medical Evidence**

      **1.      *Abigail Anderson's Testimony*[3]**

Anderson testified that she lives with her mother, twin sister, and her sister's child.[4] (R. 37.) She could identify no favorite subjects from her time being homeschooled by her mother, but stated that she sometimes liked drawing. (R. 36-37.) Anderson says that she does not have a driver's license and cannot go anywhere without her mother because she is scared. (R. 40.) She goes with her mother to the grocery store and church, but she is not involved in church activities. (R. 47.) Anderson testified that she never went to school and denied ever having a summer job. (R. 51, 54.)

---

[3]  A number of Anderson's responses were inaudible in the transcript.

[4]   Anderson's mother testified that Anderson's father also lives in the home, but they have had problems, and he had only been back in the home a few months. (R. 71.) When the ALJ asked Anderson why she had neglected to mention her father also lived with the family, she replied that she could not remember he lived with them. (R. 72.)

Anderson stated that she does mostly nothing during the day, and she stays up late, sometimes just crying. (R. 39-40.) She occasionally watches television; she does not have a favorite show, and when asked whether she knows how to change the channel, she responded, "Sometimes, and sometimes no." (R. 44-45.) Anderson helps her mother clean the house, but at times she does not do what she is supposed to do because she does not want to. (R. 41-42.)

Anderson cannot read, and she would not understand what to do even if someone showed her how to perform a task. (R. 45-46.) She cannot make change, read or watch, or take public transportation by herself. (R. 48-49.)

At one point in her testimony, Anderson denied ever trying to make lunch for her mother, even a sandwich, and said that she had never put anything in the microwave. (R. 43-44, 51.) When questioned by her attorney, Anderson admitted that her mother has often tried to teach her to use the microwave, but she "blew up something."[5] (R. 49-50.)

The medical expert asked Anderson whether her impairments have gotten worse over the last couple of years, and she stated that her reading, writing, and "mostly everything" has gotten worse. (R. 52.) Immediately thereafter, the medical expert summarized her answer with the follow-up question, "[W]hat you're saying is you used to be able to read and write better than you can now?", and Anderson

---

[5]  Anderson's response to the question whether her mother has ever tried to teach her to use the stove was inaudible, but the follow-up question suggests that the training session resulted in a fire. (R. 50.)

responded, "No, I couldn't." (R. 53.) She also denied ever having used a microwave, being able to handle money, or having friends. (*Id.*) The medical expert pointed out to Anderson that she made statements in an evaluation a couple of years ago indicating that she could do those things and asked Anderson why she would say that. Her response was, "Probably a different personality." (*Id.*)

### 2.     *Yvonne Anderson's Testimony*

Claimant's mother Yvonne Anderson ("Yvonne") testified that she has five children, including Anderson and her twin sister. (R. 57-58.) Yvonne stated that Anderson was tested for lead before she was seven years old, and she showed traces of lead in her system. (R. 70.)

Yvonne homeschooled all of her children at some point in their lives. (R. 64.) The oldest three boys were homeschooled for about a year each before returning to the Chicago Public Schools. (R. 65-66.) Anderson had limited formal schooling at Christian Liberty Academy. (R. 59.) After her brief stint in private school, Anderson and her twin sister, Sarah, were homeschooled through high school. (R. 67-68.) Sarah got her high school diploma, but Anderson did not. (R. 68.) While homeschooling Anderson, Yvonne found that her daughter had a difficult time comprehending and retaining information, including writing her name. (R. 59-60.)

Other than the claimant, all of Yvonne's children were able to go to college and get jobs. (R. 57.) One son teaches in the Chicago public schools, another does websites, and her third son graduated from UIC. (R. 60.) At the time of the hearing, her twin was in the process of starting college to become a dental assistant. (R. 57.)

Yvonne states that she has always looked forward to her children being able to function on their own, and she has been in denial about the severity of her daughter's impairments. (R. 60.) Yvonne testified that when they were sixteen, Anderson and her twin sister worked a summer job for about four hours a day at a martial arts program administered through the Chicago public schools. (R. 57-58.) Anderson was dismissed before the program ended due to disobedience and an inability to follow instructions. (R. 58-59.)

Yvonne is afraid to leave her daughter at home alone because she might let somebody in or will try to cook and start a fire. (R. 61.) Yvonne has tried to show her how to use the microwave, and sometimes she will use it properly and sometimes she will not. (*Id.*) Anderson has chores she is supposed to do around the house, but she does not do them all the time. Anderson is often disobedient, and "a lot of times it's like rearing a little child all over again." (R. 61-62.) Anderson cannot use money well, and does not understand why she cannot buy items worth fifty dollars but she only has a twenty dollar bill. (R. 60-61.)

Yvonne said many days it is difficult to get Anderson to leave her room, and that is why she would like to put her daughter into therapy, but they cannot afford it. (R. 62.) Yvonne told the ALJ that she did not consistently fill Anderson's prescription for anti-depressants because she lacks a medical card and could not get into a community clinic. (R. 77-78.)

Yvonne related examples of Anderson fabricating facts about her life, which Yvonne called "hallucinations," including that she had a son, she has a good job, and

she lives by herself. (R. 62.) Yvonne stated that Anderson does not really have friends because they make fun of her. (R. 62-63.)

### 3. *Medical Evidence*

#### a. Medical Reports[6]

**Dr. Ana Gil, M.D.**

Dr. Gil, a psychiatrist, examined Anderson for forty-five minutes on July 6, 2009. (R. 321.) The interview was conducted out of the presence of Anderson's mother. (*Id.*) Dr. Gil noted that Anderson was relaxed and calm, well dressed, well groomed, had good hygiene, and appeared to be a reliable informant. (*Id.*) During the interview, Anderson was alert and oriented to time and place; and she was engaging, friendly, polite, and related well during the interview. (R. 322.)

Anderson told Dr. Gil that she had only worked one job in her life, at a summer job "last year" for several months.[7] (R. 321.) Anderson told Dr. Gil that she cannot get a job because she has "a terrible time reading, writing, and comprehending." (*Id.*) She claimed to have been in special education classes when she was eight years old, and she attended school from ages eight through twelve. Anderson alleged that she had to leave that school because her teacher was physically abusing her and other children. (*Id.*) She was then homeschooled, but she

---

[6] This summary includes only those medical records relevant to the errors claimed by Anderson in her motion.

[7] Anderson was in fact employed the summer of 2006, three years before she was examined by Dr. Gil. (*See* R. 236.)

always had difficulty with reading and math. (*Id.*) Anderson did not know what grade she went up to while being homeschooled. (R. 322.)

Dr. Gil reported that Anderson takes care of her own dressing, grooming, and hygiene. Anderson "can use the microwave without any difficulty," she helps her mother with cleaning and laundry, and she goes with her family to the grocery store. (*Id.*) She cannot drive, and she is unable to take public transportation by herself. (*Id.*) Anderson told Dr. Gil that she likes to spend time with her friends, who come over regularly to watch television and listen to music. (*Id.*) She also stated that she is able to pay her bills herself. (*Id.*)

Anderson had a mild speech impediment and was difficult to understand at times. (R. 323.) With regard to memory testing, Dr. Gil stated that Anderson could repeat a seven-digit sequence forward and backward; she could not identify recent news except that the Fourth of July occurred recently; she knew her birthdate and address; and she was able to repeat three objects immediately and in one minute, three minutes, and five minutes. (*Id.*)

Anderson needed her fingers to perform addition and subtraction calculations. She stated she did not know how to perform multiplication calculations and did not attempt to.[8] (*Id.*) She was able to identify the name of the President with prompting, but she did not know the name of the Chicago mayor even with prompting. (*Id.*) She could not name four recent Presidents after

---

[8] In her summary assessment, Dr. Gil stated that Anderson "had some difficulty performing multiplication calculations." (R. 324.)

prompting, and when asked to name four large cities, she answered, "Chicago, New Orleans, and North Carolina." (*Id.*)

Dr. Gil diagnosed Anderson with Borderline Intellectual Functioning which may be secondary to the history of lead poisoning; speech impediment; and a history of various learning disabilities including reading, writing, arithmetic, and comprehension. (R. 324.) She also stated that if Anderson were awarded funds, she appeared able to handle them herself. (R. 324.)

**Dr. R. Leon Jackson, Ph. D.**

Dr. Jackson, a DDS consultant, completed Psychiatric Review Technique ("PRT") form on August 6, 2009. (R. 340-53.) In the PRT, Dr. Jackson concluded that a mental Residual Functional Capacity ("RFC") assessment was necessary, and he completed that form as well. (R. 354-56.) Dr. Jackson's medical disposition was based on Listings 12.02 (Organic Mental Disorders) and 12.05 (Mental Retardation). (R. 340.) In his analysis of Listing 12.05, Dr. Jackson found the presence of a medically determinable impairment that does not precisely satisfy the listing's diagnostic criteria, *i.e.*, borderline intellectual functioning which may be secondary to history of childhood poisoning, speech impediment, and a learning disability. (R. 344.)

In his RFC assessment in the area of understanding and memory, Dr. Jackson found that Anderson was not significantly limited in her ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; or to understand and remember detailed

11

instructions. (R. 354.) With respect to sustained concentration and persistence, Anderson was found to have no significant limitations on her ability to carry out very short and simple instructions; to perform activities within a schedule; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; or to complete a workday and workweek without interruptions from psychologically based symptoms. (R. 354-55.) She did, however, have moderate limitations in her ability to carry out detailed instructions; to maintain attention and concentration for extended periods; and to sustain an ordinary routine without special supervision. (R. 354.)

In the area of social interaction, Dr. Jackson found Anderson to be not significantly limited in her ability to interact appropriately with the general public; to ask simple questions or request assistance; to get along with co-workers without distracting them; and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (R. 355.) He did not rate her ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*)

As for adaptation, Dr. Jackson concluded that Anderson had no significant limitations in the ability to respond appropriately to changes in the work setting or to be aware of normal hazards and take appropriate precautions; however, she had moderate limitations in the ability to travel in unfamiliar places or use public transportation or to set realistic goals or make plans independently of others. (*Id.*)

In Dr. Jackson's summary conclusions, he opined that Anderson's limitations in sustained concentration and persistence are "secondary to a developmental

pattern of over-protectiveness on the part of the parenting figures who withdrew claimant from school at age 12 due to alleged abuse by classroom teacher and claimant was subsequently home-schooled." (R. 356.) In general, Dr. Jackson found that Anderson would be expected to have initial difficulties in training for vocational involvement due to her development of "a learned helplessness pattern." (*Id.*) He concluded that she retained the mental RFC to engage in simple, routine work activities with one- and two-step requirements. (R. 356.)

## Jennifer Floersch, M.A.

DDS consultant Floersch performed a forty-minute speech and language evaluation of Anderson on September 1, 2009. (R. 335.) Floersch found that Anderson "used slow laborious speech production which appeared to be purposefully strained in an attempt to appear impaired at times." (*Id.*) When Anderson was prompted to use her best speech, she was more intelligible. (*Id.*) Floersch found that Anderson "appeared to malinger during receptive language testing by answering the test questions incorrectly." Again, when she was asked to do her best, she performed more accurately on expressive language testing. (*Id.*)

On the Goldman Fristoe Test of Articulation, Anderson received a raw score of 2, a standard score of 94, which was in the second percentile and had an age equivalency of six years, four months. (R. 336.) Her speech intelligibility was judged to be 90% in conversational speech with a topic known to the listener and 80% with a topic unknown to the listener. (*Id.*) Her level of intelligibility did not improve with repetition. (*Id.*)

For receptive language testing, Floersch administered the Listening Communication portion of the Oral and Written Language Scale. Anderson achieved a raw score of 43, standard score of 49, a percentile rank of less than 0.1, and an age equivalency of five years, seven months. (R. 337.) She was able to demonstrate an understanding of nouns, verbs, and pronouns but had difficulty understanding prepositions and embedded sentences. (*Id.*) The scores demonstrated a profound receptive language impairment, but Floersch suspected that Anderson was not trying her best in this area of testing. (*Id.*) Floersch noted that in casual conversation, Anderson understood many complex questions,[9] which suggested that her receptive language skills are higher than the scores would indicate. (*Id.*) Accordingly, Floersch concluded that the scores should be considered with caution. (*Id.*)

In the area of expressive language, Floersch administered the Oral Expression portion of the Oral and Written Language Scale. Anderson had a raw score of 52, standard score of 57, a percentile rank of 0.1, and an age equivalency of seven years, three months. (*Id.*) Anderson could use basic nouns, verbs, prepositions, pronouns, and descriptive words in phrases. (*Id.*) She could ask questions in context and could use appropriate irregular verb forms and past tense verb forms in phrases. (*Id.*) Anderson had difficulty combining two sentences using a simple conjunction, and she struggled to define words with multiple meanings.

---

[9] Floersch's report did not list any of the complex questions she said Anderson understood.

(*Id.*) She could not make a sentence after begin given four written and verbally spoken words, stating, "I can't read." (*Id.*) Her scores indicated a severe expressive language impairment. Floersch then took an informal spontaneous language sample to further assess her expressive language skills. She could produce some communicative intentions such as responding, labeling, and informing, and she could maintain a topic of conversation and demonstrate basic conversational turn-taking skills. (R. 338.) However, she demonstrated inappropriate narrative skills for her age. She had difficulty in labeling the events in her day and describing them sequentially. Her utterance length and complexity were also inappropriate for her age; her typical utterances were four words in length, *e.g.,* "My mother took me. Train. Watch TV. Sit down. No, not really. Just clean up a little. A veterinarian. I love dogs. I have one at home. Lou and Lady. We got two. Really I help out. I help feed um." (*Id.*)

Floersch concluded that Anderson's articulation, oral mechanism, fluency, and voice appeared within normal limits and adequate for functional communication in her environment. Her expressive language skills appeared to be severely impaired. Her receptive language skills also appeared impaired; however, those scores may not indicate the accurate functioning level due to possible malingering. Floersch found that Anderson's impaired language skills are likely to impair her ability to functionally communicate. (*Id.*)

Anderson told Floersch that she would like to go to college and become a doctor. (R. 336.) Anderson reported her educational history as attending a private elementary school until the eighth grade, when she began to be homeschooled. (*Id.*)

**Dr. Harvey I. Friedson, Psy. D.**

Dr. Friedson examined Anderson on August 20, 2010, for approximately two hours. (R. 387-91.) At the examination, Yvonne related to Dr. Friedson that claimant's language development was delayed, and she did not begin talking until she was five or six. (R. 388.) Yvonne also stated that Anderson was home schooled beginning at the age of seven. (*Id.*) Anderson has three siblings who completed college, and her twin sister was in the process of beginning college. (R. 389.) Yvonne stated that Anderson goes everywhere with her. (*Id.*) Anderson presented somberly, with no range of affect, and she never smiled. (*Id.*) She could produce understandable speech, although it was generally just above a whisper. (*Id.*)

Dr. Friedson administered the Wechsler Adult Intelligence Scale - IV test, which showed index scores of 61 for verbal comprehension, 58 for perceptual reasoning, 60 for working memory, 50 for processing speed, and a full-scale IQ of 51. (R. 387-88.) Dr. Friedson stated that the testing was within the cognitively impaired range. (R. 389.) She did not really comprehend digit sequencing, and she could not do simple addition or subtraction. (R. 390.)

The Wide Range Achievement Test, 4th Edition, resulted in a standard score of 55 in all areas, with a grade score of K.7 for word reading, K.2 for sentence comprehension, K.4 for spelling, and <Kindergarten for math computation. (R. 388.)

Dr. Friedson concluded that Anderson's performance was consistent with cognitive impairment and that she was functioning at the Kindergarten level. (R. 390.) She could not do simple addition, subtraction, or spelling, although she was able to print her name. (*Id.*) Anderson could read the words "book," "cat," and "in," but she could not read "tree," "animal," or "hair." (*Id.*)

Dr. Friedson found that both assessments "would be consistent with mental retardation." (R. 391.) He stated that the test results were internally consistent and were consistent with her presentation, but noted that there was an absence of supporting documentation. (*Id.*) He also found that she would not be able to manage her own finances. (*Id.*)

### b.     Medical Expert's Testimony

Dr. Larry Kravitz testified at the hearing as a medical expert. He noted that Anderson had been diagnosed with borderline intellectual functioning and had been treated for depression. (R. 74.) With respect to Dr. Friedson's report, he noted that there was no formal diagnosis of mental retardation, but based on his statement that the assessments are consistent with mental retardation, "I guess that's another diagnosis that's been offered." (*Id.*)

The ALJ asked the medical expert to reconcile the evaluations of Dr. Friedson and Dr. Gil. Dr. Kravitz pointed out that the evaluations are markedly different as to Anderson's presentation and scores, which could be a function of motivation or depression. (R. 74-75.) He stated that the evidence indicates deterioration, but the underlying reasons for that deterioration are unclear. (R. 75.)

Dr. Kravitz noted Yvonne's rationale for Anderson's deterioration, which was that she has seen others in her life achieve more, causing her to be more depressed and withdrawn, as evidenced by her prescriptions for anti-depressants. (R. 75-77.)

Dr. Kravitz noted that there are few non-acute medical conditions that would cause a person to forget what they had previously learned. (R. 78-79.) He noted that in 1996 speech testing records, most of Anderson's language scores fell between the ninth and the seventeenth percentiles, which are consistent with intellectual functioning in the borderline range. (R. 79.) He found that a diagnosis of mild mental retardation was not accurate, as it was not historically the case, and there is no evidence of any condition that would cause her functioning to decline over time. (*Id.*) Dr. Kravitz concluded that her more recent inhibition and resulting failure to perform up to her capability was possibly the result of depression or lack of motivation but likely not mental retardation. (*Id.*)

Dr. Kravitz found that Anderson would have to be functioning at a much lower level to lack the ability to even put peanut butter on a piece of bread, having been able to do that before. (R. 80.) He ultimately concluded that her limitations should not be evaluated in the context of Listing 12.05, but rather 12.02. (R. 80-81.) Dr. Kravitz found that her impairments did not meet or equal Listing 12.02 because of his considerations of the inconsistencies in the record and his general belief that she should be more capable than she is presenting. (R. 81.) However, if he were to credit the testimony of Anderson and her mother, he would find marked limitations in all areas and conclude that she met the listing. (*Id.*) But in the Dr. Gil

evaluation, Anderson demonstrated certain capabilities, particularly the seven digit span, which showed a fairly high level of attention. (R. 81-82.) Due to the inconsistencies in the record, Dr. Kravitz concluded that Anderson did not meet the part B limitations of the listing. (R. 82.) He believed that Anderson should be capable of understanding, remembering, and carrying out one- and two-step instructions. (*Id.*) Dr. Kravitz questioned, however, whether she could sustain that ability on an "extended, continuous basis . . . [w]ithout the need for an extraordinary amount of supervision and instruction." (R. 83.)

Anderson's attorney asked Dr. Kravitz whether she could have self-reported greater abilities to Dr. Gil than Dr. Friedson because her mother was not in the room during the examination with Dr. Gil. As her mother testified, Anderson tended to fabricate in order to project herself as being better than she is. (R. 84.) Dr. Kravitz agreed that Anderson fabricated due to self-esteem issues, and Dr. Gil's failure to meet with her mother could have influenced the assessment. (*Id.*) However, Dr. Kravitz noted that even the shared mental status findings were notably different in those examinations, *i.e.,* she was engaging and cooperative, and her thinking was logical and coherent. (R. 84-85.) The attorney then asked whether Anderson's varying levels of effort, which were consistent with Yvonne's testimony about her daily activities, could itself lead to inconsistent work performance. Dr. Kravitz did not believe that was necessarily the case, in part based on the possible malingering described in the speech therapy report. (R. 85.)

### 4. *Vocational Expert's Testimony*

Richard Hammersmith testified as the Vocational Expert ("VE"). The ALJ asked him whether there were any jobs in the economy for a hypothetical individual with Anderson's same age, educational background, and past work experience, who could not understand written instructions and was limited to simple, routine work with a maximum of two steps. The individual would have limited interaction with public, co-workers, and supervisor; and would need to work in a routine and predictable environment. (R. 87.) The VE responded that in the Chicago metropolitan area, such a person could perform at the light level approximately 10,000 housekeeping jobs and 7,000 hand packaging jobs; and at the medium level, there are approximately 5,000 jobs as a kitchen helper. (*Id.*) If the person could not remain on task at least 88 to 90% of the time, or if they were absent more than two days per month, they would not be employable. (R. 88.) All of these jobs are to be learned within thirty days or less. (R. 95.)

In response to questioning by Anderson's attorney, the VE stated that a person who would have to be told multiple times how to perform a task, or who refuses to do a task, would not be employable in a competitive environment. (R. 89-90.)

### C. __ALJ Decision__

At step 1, the ALJ found that Anderson had not engaged in substantial gainful activity since her March 16, 2009, application date. (R. 13.) At step 2, the ALJ concluded that Anderson suffered from the following severe impairments:

learning disability, cognitive impairment, and depression. (*Id.*) However, at step 3, it was determined that none of her impairments met or medically equaled Listings 12.02 (Organic Mental Disorders) or 12.04 (Affective Disorders). (R. 13-15.) The ALJ did not analyze Anderson's impairments under Listing 12.05 (Mental Retardation).

The ALJ then determined Anderson had the RFC to perform a full range of work at all exertional levels with the following limitations: simple, routine work; limited interaction with the public; limited contact with co-workers – working in proximity with others but not on joint tasks; limited contact with supervisors; routine and predictable environment; and limited ability to read. (R. 15.)

No step 4 finding was required in this case, as the ALJ concluded that Anderson had no past relevant work. (R. 23.) At step 5, the ALJ found that given Anderson's age, education, work experience, and RFC, she could perform significant numbers of jobs in the national economy and therefore was not disabled. (R. 23-24.)

## III.   DISCUSSION

### A.   ALJ Legal Standard

Under the Social Security Act, a person is disabled if he has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42. U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled, the ALJ considers the following five questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does

the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform his former occupation?  and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920(a)(4) (2008).

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled.  *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).  A negative answer at any step, other than at step 3, precludes a finding of disability.  *Id.*  The claimant bears the burden of proof at steps 1-4.  *Id.* Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the ability to engage in other work existing in significant numbers in the national economy.  *Id.*

## B.    Judicial Review

Section 405(g) provides in relevant part that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are support by substantial evidence or based upon legal error.  *Clifford v. Apfel,* 227 F.3d. 863, 869 (7th Cir. 2000); *Stevenson v. Chater*, 105 F.3d 1151, 1153 (7th Cir. 1997).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Skinner* 's *v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence,

resolving conflicts in evidence, or deciding questions of credibility. *Skinner*, 478 F.3d at 841.

The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits." *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001). In cases where the ALJ denies benefits to a claimant, "he must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ "must at least minimally articulate the analysis for the evidence with enough detail and clarity to permit meaningful appellate review." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Murphy v. Astrue*, 498 F.3d 630, 634 (7th Cir. 2007) ("An ALJ has a duty to fully develop the record before drawing any conclusions, and must adequately articulate his analysis so that we can follow his reasoning.").

Where conflicting evidence would allow reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the court. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). However, an ALJ may not "select and discuss only that evidence that favors his ultimate conclusion," but must instead consider all relevant evidence. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

**C.** **Analysis**

Anderson argues that the ALJ erred by (1) failing to properly analyze her claim of mental retardation under Listing 12.05; and (2) incorrectly assessing the credibility of Anderson and her mother.

### 1. *Mental Retardation*

The RFC section of the ALJ's decision mentions Dr. Gil's diagnosis of borderline intellectual function; Dr. Friedson's finding that Anderson's assessments were consistent with mental retardation (noting that he did not offer a diagnosis of retardation); and Dr. Kravitz's opinion that mild mental retardation is not an accurate diagnosis. The ALJ did not, however, analyze Anderson's impairments under Listing 12.05, which provides that the following criteria must be established for a finding of mental retardation:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22. The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> B.    A valid verbal, performance, or full scale IQ of 59 or less; Or
>
> C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function; Or
>
> D.    A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>      1.    Marked restriction of activities of daily living; or
>      2.    Marked difficulties in maintaining social functioning; or

24

3.     Marked difficulties in maintaining concentration, persistence, or pace; or

4.     Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Anderson argues that the ALJ improperly discounted her IQ score in favor of the opinions of non-examining consultants. Anderson also faults the ALJ's reliance on the diagnosis of borderline intellectual functioning in concluding that she is not mentally retarded. The government responds that Anderson's condition failed to meet the criteria of Listing 12.05 because borderline intellectual functioning and mental retardation are mutually exclusive diagnoses, and therefore she cannot meet the diagnostic criteria in the introductory paragraph of the listing.

The Court first notes that although the ALJ mentioned in the RFC section of her decision that no evaluator or expert concluded Anderson was mentally retarded, she did not discuss the applicability of Listing 12.05 at all. Thus, "[i]n defending the administrative law judge's decision on the ground that [she herself] did not mention, the government violates the *Chenery* principle." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006); *see SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *see also Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("On appeal, the Commissioner may not generate a novel basis for the ALJ's determination. To permit meaningful review, the ALJ was obligated to explain sufficiently what she meant . . . .").

Moreover, the idea that an ALJ need not discuss a listing whose requirements a claimant fails to meet is circular at best: "'[I]n arguing that the ALJ was not required to discuss [a listing] due to the insufficiency of the evidence, the Commissioner puts the cart before the horse. It is only after reviewing the evidence that the ALJ could have made an informed determination as to whether the Listing's requirements had been met.'" *Thomas v. Astrue*, No. 09 C 7851, 2011 WL 5052049, at *7 (N.D. Ill. Oct. 19, 2011) (citation omitted).

The failure to discuss Listing 12.05 is perplexing, as it was not an issue foreign to the case. In fact, Listing 12.05 was the only one expressly mentioned by Anderson's attorney at the hearing. (R. 35.) If the ALJ had considered and rejected the listing's application she should have said so. It is certainly possible that she found it inapplicable for the reasons now offered by the government, but she may have done so on an entirely different basis. It is also possible that her failure to discuss the listing was an oversight. The decision gives no insight as to whether the government's proffered rationale was the one relied on by the ALJ.

Having failed to provide any analysis, the ALJ did not meet her burden of minimally discussing and considering evidence of disability. *See Zurawski*, 245 F.3d at 888 ("'Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.'") (citation omitted) (emphasis in original). The Court therefore finds that the case

should be remanded to allow consideration of Anderson's impairments in relation to Listing 12.05.

The Court notes that even if the ALJ had expressly stated the reasons now given by the Commissioner, remand would nevertheless be necessary. First, the government's argument that the introductory paragraph of Listing 12.05 requires an explicit finding of mental retardation before IQ and other impairments are considered was rejected by the Seventh Circuit without comment in *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) (citing *Maresh v. Barnhart*, 438 F.3d 1073, 1075 (8th Cir. 2005)).[10] Other cases have discussed the issue more thoroughly, and the Court finds their reasoning persuasive.

In *Maresh*, the Eighth Circuit agreed that the requirements in Listing 12.05's introductory paragraph are mandatory but disagreed that the paragraph requires a formal diagnosis of mental retardation. *Maresh*, 438 F.3d 897, 899 (8th Cir. 2006). The court explained that the plain language of the listing does not include such a requirement and further noted that the Commissioner rejected a proposal to include the definition of mental retardation included in the Diagnostic and Statistical

---

[10] One day before *Mendez* was decided, the Eighth Circuit issued a superseding opinion, *Maresh v. Barnhart*, 438 F.3d 897 (8th Cir. 2006), which added a footnote discussing the issue of the specific period of claimant's disability. *See id.* at 901 n.3.

Manual of Mental Disorders - Fourth Edition when the listing was revised in 2002.[11] *Id.* The Court agrees that the plain language of Listing 12.05's diagnostic description requires a finding of significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, rather than a formal, express diagnosis of "Mental Retardation." *See also Witt v. Barnhart*, 446 F. Supp. 2d 886, 895 (N.D. Ill. 2006) ("[I]n order to satisfy Listing 12.05's capsule requirement, a claimant must satisfy the diagnostic *description*, i.e., deficits in adaptive functioning manifested prior to the age of twenty-two, and need not produce a formal diagnosis of mental retardation.") (emphasis in original). The Court does not accept the Commissioner's argument that an ALJ need not discuss Listing 12.05 for a claimant whose IQ was measured at 51, and whose developmental history is not inconsistent with that score, unless she has been diagnosed with "Mental Retardation" in quotation marks. *See Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) ("The key term in the introductory paragraph of section 12.05 . . . is 'deficits in adaptive functioning.' The term denotes inability to cope with the challenges of ordinary everyday life. . . . If

_____

[11]  In response to the comment seeking to use the DSM-IV definition, the agency stated that the definition in the listings is consistent with the definitions used by the four leading professional organizations that deal with mental retardation ("MR"). Furthermore, *"[t]he definition of MR used by the SSA in the listings is not restricted to diagnostic uses alone, nor does it seek to endorse the methodology of one professional organization over another.* While capturing the essence of the definitions used by the professional organizations, it also is used to determine eligibility for disability benefits. SSA's definition establishes the necessary elements, while allowing use of any of the measurement methods recognized and endorsed by the professional organizations." 67 Fed. Reg. 20,022, 2002 WL 661740, at *20022 (Apr. 24, 2002) (emphasis added).

you cannot cope with those challenges, you are not going to be able to hold down a full-time job.").

The diagnosis of borderline intellectual functioning is also not fatal to a finding of mental retardation under Listing 12.05. In *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999), the Seventh Circuit held that a diagnosis of borderline intellectual functioning was relevant to the issue of whether the score was valid, but the diagnosis alone was not dispositive on the score's validity, let alone the applicability of Listing 12.05. The court found that the claimant's 68 IQ score was invalid was in part based on a diagnosis of borderline intellectual functioning but also on his failure to eat for two days before the test; his consumption of alcohol until two in the morning the day of the test; and his work history, which demonstrated an ability to relate to co-workers and supervisors, understand and follow instructions, and withstand the stresses of day-to-day activities. *Id.* In any event, the ALJ in *Maggard* "included a discussion of his reasons for concluding that Maggard's IQ score was invalid." *Maggard*, 167 F.3d at 380. The ALJ in this case did not find the 51 IQ score to be invalid or inconsistent with her developmental history, nor did she otherwise explain why the listing's requirements were not met.

Due to Plaintiff's lack of formal schooling, there is a dearth of objective evidence of testing, special education, or any other measure of Anderson's cognitive abilities. Therefore, the ALJ may find it helpful on remand to order other consultative mental examinations to more fully develop the record in relation to claimant's cognitive functioning. *See Winfield v. Barnhart*, 269 F. Supp. 2d 995,

1007 (N.D. Ill. 2003) (finding ALJ's decision of invalidity of IQ tests was supported by substantial evidence where "[i]n order to create a full and fair record of the Claimant's cognitive functioning, the ALJ ordered multiple psychological evaluations and heard the testimony of expert witnesses"). If not, the ALJ should explain the reasons why additional examinations are not necessary. *See Avery v. Astrue*, No. 11 C 7471, 2012 WL 6692120, at *3 n.1 (N.D. Ill. Dec. 19, 2012).

### 2. *Credibility*

At the hearing, the ALJ commented that if she were to credit Anderson's testimony, "she presents as disabled." (R. 92.) In her ruling, however, the ALJ found that Anderson's and Yvonne's statements about the severity of her impairments "are simply not credible" based upon numerous inconsistencies and a lack of documentation supporting her impairments.[12] (R. 21.) For example, the ALJ noted that Anderson testified that she could not make a peanut butter and jelly sandwich, do laundry, or use a remote control, but she admitted being able to perform these activities to consultative examiners. (*Id.*) She also emphasized the speech examiner's suspicion of malingering, which the ALJ felt could explain her performance decline in later examinations. (*Id.*)

---

[12] The ALJ credibility assessment included boilerplate language often criticized by the Seventh Circuit. *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). However, because she also listed specific reasons why she found the testimony to be incredible, the inclusion of the boilerplate does not by itself justify remand. *See Pepper v. Colvin*, — F.3d —, 2013 WL 1338123, at *14 (7th Cir. Apr. 4, 2013).

The ALJ also discounted Yvonne's claims that she had not sought much help for Anderson's depression because she lacked a medical card. The ALJ believed that if the symptoms were truly disabling, she would have more aggressively sought help through city clinics. (*Id.*) The ALJ relied strongly on the opinions of the medical expert, Dr. Kravitz, who ultimately concluded that Anderson could be able to carry out one- and two-step instructions. (R. 22-23.) The ALJ also gave some weight to the opinion of Dr. Jackson, the DDS consultant, who found that Anderson had only mild restrictions in numerous areas, and that her difficulties stemmed from a learned helplessness pattern caused by overprotective parenting figures. (R. 22.) Despite finding her allegations incredible, the ALJ stated that she gave Anderson "the benefit of the doubt" and reduced her RFC to reflect certain limitations. (R. 23.)

An ALJ's credibility determination is granted substantial deference by a reviewing court unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). However, an ALJ must give specific reasons for discrediting a claimant's testimony, and "[t]hose reasons must be supported by record evidence and must be 'sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'" *Lopez* ex rel. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003) (quoting *Zurawski*, 245 F.3d at 887-88). When assessing the credibility of an individual's statements about symptoms and their functional

effects, an ALJ must consider all of the evidence in the case record. *See* SSR 96-7p.[13]

"This includes . . . the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists . . . and any other relevant evidence in the case record." *Id.* at *1. In instances where the individual attends an administrative proceeding conducted by the adjudicator, the adjudicator may also consider his or her own observations of the individual as part of the overall evaluation of the credibility of the individual's statements. *Id.* at *5.

Anderson contends that the ALJ improperly found her not to be credible by overly relying on minor inconsistencies in the record, disregarding its overall consistency. She maintains that many of the prior "inconsistent" statements were "double hearsay" recordations of a third party's understanding of what was said by Anderson and her mother and thus do not necessarily demonstrate inconsistency.

The government responds that the various inconsistencies in the record demonstrate that the ALJ's credibility determination is not patently wrong. The government points out that Floersch considered possible malingering; Anderson reported to Dr. Gil that she had difficulty filling out a job application, but she had worked as a martial arts instructor the previous summer; and she appeared more impaired at Dr. Friedson's examination than she had at examinations performed by

---

[13] Interpretive rules, such as Social Security Regulations ("SSR"), do not have force of law but are binding on all components of the Agency. 20 C.F.R. § 402.35(b)(1); *accord Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999).

Dr. Gil or Floersch. The Commissioner also notes Dr. Kravitz's conclusion that a decline in functioning over time is unlikely. Finally, the government argues that Anderson's failure to receive treatment for her condition is not consistent with totally disabling symptoms.

The ALJ found it incredible that Anderson could have forgotten how to perform certain tasks over time. That finding presupposes that Anderson actually had the abilities she described to Dr. Gil. But the ALJ did not consider the possibility that Anderson was fabricating her abilities in the evaluation, instead assuming she was fabricating her lack of ability at the hearing. However, Dr. Kravitz agreed that Anderson will sometimes fabricate increased abilities due to self-esteem issues, in an effort to maker herself seem better than she actually is. One fact in Dr. Gil's report not discussed at any length by the ALJ suggests that Anderson was inflating her capabilities. She told Dr. Gil that she pays her own bills, but there is no suggestion in the record that Anderson has bills, income, or a bank account. The ALJ did not explore this inconsistency at the hearing.

In addition, the ALJ's credibility determination "is undermined by [her] literalism." *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006). Anderson's statement that she cannot use a microwave does not mean that she has never done so. The reason she gave for no longer being allowed to use it, *i.e.*, she blew something up, necessarily means she has used one in the past. Furthermore, the fact that she may not be capable of learning how long an item can be in the microwave without exploding is at least as relevant to her ability to function in a

33

competitive workplace as is her physical capacity to push the start button. *See Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006) ("You don't want someone who doesn't know when to stop watering your plants; she is likely to drown them.").

The government's emphasis on Anderson's prior employment is also not persuasive. Neither the ALJ nor any evaluator discussed her mother's testimony that she was dismissed from that job for disobedience and an inability to follow instructions.

Finally, the Court finds that the ALJ did not properly review Floersch's report in concluding that it demonstrates a general tendency to malinger. The report stated a suspicion of malingering solely in one area, receptive language testing. In the area of expressive language, administered a test and took an informal language sample to further assess Anderson's skills. Floersch found severe impairment but did not suggest that there was any malingering or lack of effort in this area of functioning.

## CONCLUSION

For the foregoing reasons, Anderson's motion for summary judgment [Doc. No. 24] is granted in part and denied in part. The Court finds that this matter should be remanded to the Commissioner for further proceedings consistent with this opinion.


SO ORDERED.                         ENTERED:


DATE:   __April 15, 2013__          _____
                                    **HON. MARIA VALDEZ**
                                    **United States Magistrate Judge**